**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
THE WINGATES, LLC, and MATRIX
REALTY GROUP, INC.

                    Plaintiffs,              **MEMORANDUM OF**
                                             **DECISION AND ORDER**
              -against-              12-CV-3880 (ADS)(ARL)

COMMONWEALTH INSURANCE
COMPANY OF AMERICA,

                    Defendant.
--------------------------------------------------------X
<u>**APPEARANCES:**</u>

**Gerard J. McCreight, Esq.**
*Attorney for the Plaintiffs*
1201 Route 112
Port Jefferson Station, New York 11776

**Rivkin Radler, LLP**
*Attorneys for the Defendant*
926 Reckson Plaza
Uniondale, NY 11556-0111
    By:  Michael A. Troisi, Esq.,
         Sean F. McAloon, Esq., Of Counsel

**Fisher Kanaris PC**
*Attorneys for the Defendant*
200 South Wacker Drive
22nd Floor
Chicago, IL 60606
    By:  Peter E. Kanaris, Esq.
         Jefferson D. Patten, Esq., Of Counsel

**SPATT, District Judge**.

       On or about July 6, 2012, the Plaintiffs The Wingates, LLC (the "Wingates") and Matrix

Realty Group, Inc. ("Matrix")(collectively the "Plaintiffs") commenced this action in New York

State Supreme Court as a result of an insurance coverage dispute with the Defendant

Commonwealth Insurance Company of America ("Commonwealth").  This action was thereafter removed to this Court by Commonwealth.

This action stems from a fire on November 10, 2011 which damaged certain buildings owned by the Wingates and insured by Commonwealth.  Distilled to its essence, the Plaintiffs claim that Commonwealth failed to pay the insurance proceeds to them arising as a result of the fire.  On the other hand, Commonwealth claims that no final coverage determination was ever made due to the Plaintiffs' failure to cooperate with its investigation.

Following the close of discovery, on December 16, 2013, Commonwealth moved pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56 for summary judgment dismissing the complaint in its entirety.

On March 21, 2014, the Plaintiffs filed their opposition papers to Commonwealth's motion for summary judgment.  As part of this opposition, the Plaintiffs filed an affidavit executed by their public adjuster, Steven G. Hess, who at times purported to provide expert opinions regarding common insurance claim standards and practices.

On April 21, 2014, Commonwealth moved to strike Hess's affidavit on the basis that the Plaintiffs failed to disclose him as an expert pursuant to Fed. R. Civ. P. 26(a)(2).

On April 29, 2014, the Plaintiffs filed a letter motion, addressed to United States Magistrate Judge Arlene R. Lindsay, seeking to re-open discovery for the purpose, among others, of designating two witnesses, including Hess, as experts.

For the following reasons, the Court (1) denies the Plaintiffs' letter motion to reopen discovery and designate the two witnesses as experts; (2) grants in part and denies in part Commonwealth's motion to strike Hess's affidavit; and (3) grants Commonwealth's motion for summary judgment dismissing the complaint.

# I.   BACKGROUND

Unless stated otherwise, the following facts are drawn from the parties' Rule 56.1 statements.  Triable issues of fact are noted.

A.  <u>The Parties and the Properties</u>

Matrix is a New York corporation headquartered in Long Island.  The Wingates is a District of Columbia limited liability company that owns an apartment complex in Columbus, Ohio, commonly known as the Wingates LLC and/or Oakbrook Manor (the "Complex.")

At all relevant times, the sole member of the Wingates was Glen Nelson, who is also the sole shareholder of Matrix.

The parties dispute whether Matrix has an ownership in the Wingates or the Complex. The Plaintiffs concede that Matrix does not have any memorialized membership interest in Wingates.

Commonwealth is an insurance company that is licensed and registered to conduct business in New York State and headquartered in Washington State.

Included within the Complex were two apartment buildings located at 4540 and 4530 Longest Drive South (the "Primary" and "Secondary" Building, respectively and collectively the "Buildings").  The Complex consists of more than 130 buildings.

From September through November 2011, non-party Mark Rumney was the construction manager at the complex; non-party Nestor Valadez was the assistant construction manager at the Complex; and non-party Sue Mollotte was the property manager at the Complex.  Until September 2011, non-party Edwin LaChapelle was the Regional Manager of the Complex.

B. The Insurance Policy

In June 2011, Commonwealth issued an insurance policy to Matrix in connection with the Complex, with effective dates of June 23, 2011 through June 23, 2012 (the "Policy"). The Policy insured against various losses at the Complex, including those caused by fire. Under the terms of the Policy, in the event coverage existed, any recovery was limited to the actual cash value of the damage to the Buildings caused by the fire; i.e. replacement cost less depreciation. The Policy excluded from coverage any loss caused by wear and tear or gradual deterioration. Finally, the Policy insured other properties in different states owned by different entities that have the same management and ownership as the Plaintiffs.

The Policy defined the "Named Insured" as including "all subsidiary, affiliated, related, or allied companies, corporations, firms or organizations (as they now are or may hereafter be constituted) or persons for which the insured has the responsibility for placing insurance and for which more specific coverage does not otherwise exist." The Plaintiffs contend that the interrelationship between the Wingates and Matrix leads to the conclusion that Matrix, as well as Wingates, have an insurable interest in the Complex under the Policy.

In this regard, the Plaintiffs admit that there is no written agreement or similar document detailing that Matrix assumed liability for the Complex. The Plaintiffs maintain that no such documents were required by the terms of the Policy for Matrix to qualify as a "Named Insured" under the Policy.

Endorsement 4 to the Policy was a Statement of Values for property desired to be insured under the Policy (the "Statement of Values"). The Endorsement, effective as of June 23, 2011, was signed by Nick Tambakis, the managing director and controller of Matrix, and identified the replacement cost of the Primary and Secondary Buildings to be $1,313,700 each.

4

Further, pursuant to the terms of the Policy, the "Named Insured" was required to provide documentation "showing the interest of the Insured and of all others in the property" as well as "any changes in occupation, location, possession, exposures, title or use of the property since the issuance of th[e] Policy." Of further importance, the Policy provided that:

> The Insured, as often as may be reasonably required … shall submit, and insofar as is within his or their power cause his or their employees, members of the household and others to submit, to examinations under oath … and, as often as may be reasonably required, shall produce for examination all writings, books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost.

Additionally, the "Insured" was required to "keep accurate books, records and accounts," and to "produce for examination by the Company or its duly authorized representative all the books and records, inventories and accounts" relating to the Complex.

> The Misrepresentation and Fraud provision of the Policy provided:

> This entire Policy shall be void if, whether before or after a loss, the Insured has concealed or misrepresented any material fact or circumstance concerning this Insurance or the subject thereof, or the interest of the Insured therein, or in case of any fraud or false swearing by the Insured relating thereto.

The deductible applicable to any loss at the Complex under the Policy was $100,000 per occurrence. Finally, the Policy contained a provision limiting a claimant's time to commence litigation on a claim to one year from the date claim arose.

C. The Events Leading up to the Fire

During 2011 and prior to the fire, Rumney and Valedez conducted a unit by unit walkthrough of vacant buildings at the Complex to develop a budget for potential repairs to each unit and building to make them tenantable. Some photographs of the vacant buildings and units were also taken at that time. The Plaintiffs insist that no inventory or itemization of personal property or fixtures was ever made regarding the Buildings.

Meanwhile, on September 22, 2010, Commonwealth conducted a loss prevention inspection of the Complex. Commonwealth contends that its loss prevention inspection provided general information and made no reference to any specific building or the condition of either the Primary or Secondary Buildings.

Also, prior to the fire, certain appliances and fixtures were removed from vacant units in the Buildings as part of the Plaintiffs' plan for renovating buildings in the Complex. LaChapelle and Mollette testified that anything useful and operational, including furnaces, hot water heaters, toilets, sinks, range ovens, refrigerators, and doors had been previously removed from almost all of the vacant buildings at the Complex, including the Primary and Secondary Buildings.

D. The Fire and the Respective Investigations

On November 10, 2011, the Primary Building caught fire and ultimately was destroyed. During the course of the fire, the Secondary Building incurred exterior damages to heat from the Primary Building. Matrix notified Commonwealth regarding the loss in a prompt manner.

At the time of the fire, the Buildings were vacant and boarded up. On the day of the fire, in order to prevent unauthorized entry into the area, a six foot chain-link fence was erected around both buildings with a locked gate.

Following the fire, Matrix retained the services of M.H.D. Adjusting Co., Inc., of which Hess is the President, to "act or aid in the preparation, presentation, adjustment and negotiation of or effecting the settlement of the claim." Hess has 44 years of experience as a public adjuster for the Plaintiffs, and has assisted insureds with thousands of insurance claims resulting from fires.

Hess testified that he could not recall having any conversations or communications with Mollette, and that he had "no detailed conversations" with Rumney, Valadez, McGilvary, and

Lachapelle. Hess was in communication with Tambakis and Nelson for the purpose of obtaining information regarding the Plaintiffs' claims. However, Hess never personally visited the Complex or inspected the Buildings.

Rather, Hess hired Zendler Construction Corp. ("Zendler Construction") to examine the damage caused by the fire. Eugene Zendler, the President of Zendler Construction, visited the Complex on November 16, 2011 to examine the damage caused by the fire. Zendler walked through 8 out of 24 units of the Secondary Building.

Ultimately, Hess submitted to Commonwealth Zendlers' damages, and Sworn Statements in Proof of Loss ("Sworn Proofs") for the Primary and Secondary buildings in the amounts of $3,250,343.13 and $631,779.80, respectively. The Sworn Proofs were prepared by Hess and signed by Nelson. In preparing the Sworn Proofs and submitting them to Commonwealth, Hess did not confirm whether or not the items being claimed existed prior to the fire and had no conversations with Nelson to confirm whether or not the items being claimed existed in the Buildings at the time of the fire.

The Sworn Proofs provide in pertinent part:

> … no articles are mentioned herein or in annexed schedules but such as were destroyed or damaged at the time of said loss; no property saved in any matter been concealed and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made. Any other information that may be required will be furnished and considered part of this proof.

The Zendler scope and Matrix's sworn claim requests the replacement of a refrigerator, sink, dishwasher, range, furnace, hot water heater, vanities, toilets, and sinks, and interior doors. However, Zendler testified that he did not know whether or not these items were present in any of the units at the time of the fire. (Zendler Dep, at 40.) The Plaintiffs admit that if Zendler was

called to testify as an expert at the trial, he could not give testimony with regard to what condition either Building was in prior to the fire.  In this regard, Zendler testified as follows:

> Q: And you were given a set of plans of how the building was originally constructed, and you used those plans, correct?
>
> A: Yes.
>
> Q. And you basically estimated, or guestimated what the interior finishes would be based on those plans and based on looking at other buildings?
>
> A. Yes.
>
> Q. And you were never told at any point in time what the actual condition of that building was prior to the fire; correct?
>
> A. Correct.
>
> Q.  And you never made an inquiry into the condition of that building prior to the fire, correct?
>
> A. Correct.

(Id. at 50-51.)  Zendler further acknowledged that the condition of a building likely changed over the years based on the length of vacancies. (Id. at 59.)

At some point, Hess e-mailed Nelson and indicated that Zendler's scope for the replacement of the Primary Building contained "approximately 35% fat."  After being shown this email at his deposition, Hess testified as follows:

> Q:  What were you referring to, "approximately 35 percent fat?"
>
> A.  The unit costs have a certain amount of subjectivity to them, and usually my guideline in terms of adjusting and negotiating the settlement is there's about a 35 percent cushion in the estimate.
>
> Q.  So there's a 35 percent – in construction estimating, there's a 35 percent gap between where they could be?
>
> A.  In terms of subjectivity, based upon a difference in conditions, based on overhead and profit, based on contractor's insurance.  I mean, there are variables that have a certain amount of flexibility in them, subjectivity to them.

Q. So, you are referring to "variance," and I find – you refer to "variance" within the term "fat"?

A. Yes.

(Hess Dep, at 82-83.)

By letters dated January 23, 2012, February 8, 2012, and March 1, 2012, Commonwealth sought from the Plaintiffs appraisals of the Primary and Secondary Buildings, along with any documentation or photographs detailing the pre-fire condition of the Buildings and maintenance or repairs. Rent rolls and information regarding the length of the vacancy of the Buildings was also requested.

Upon receipt of these letters, Hess instructed the Plaintiffs to comply with Commonwealth's request for the Examinations Under Oath, and explained to Matrix's in-house general counsel the potential ramifications for failing to comply.

By letter dated May 25, 2012, not having received responsive documents, Commonwealth invoked its right to take the examination under oath of certain employees and representatives of the Plaintiffs in connection with the claimed loss.

Acknowledging that he was advised by Hess to schedule and sit for the examinations or he would be in breach of the Policy, Nelson stated at his deposition as follows:

> just so you have that on the record, because the insurance companies, the overwhelming majority of them are crooks who love to extort on the yearly annual premium. And then when it comes time to pay, they try to weasel their way out of not paying and hurt the little guy. Therefore, we are going to sue and sue and appeal, and we are going to spend a lot of time and effort just to cost the client a significant sum of money on legal fees, for the record.

(Nelson Dep, at 38.) Hess then emailed Nelson, informing him as follows:

> That's fine however they have demanded an examination under oath pursuant to the insurance contract. If you don't contact them to schedule the examination and cooperate you are in violation of the policy and that will come back to haunt you.

(Id. at 38-39)  Significantly, neither Nelson nor anybody else representing the Plaintiffs ever appeared at an Examination Under Oath.

Commonwealth also conducted its own investigation of the damage caused by the fire. On November 15, 2011, Commonwealth directed Madsen Kneppers and Associates ("MKA") to examine and report on the damage caused by the fire.  MKA concluded that the Primary Building was a complete loss, and had a replacement value of $2,427,196.24 with an all cash value of $1,767,555.10, in excess of the policy limits of $1,313,700.  MKA also found that the Secondary Building sustained damage with repair costs of $11,168.74 and an all cash value of $7,959.71.

E.  The Present Litigation

On or about July 6, 2012, about 4.5 months before the one-year contractual period to sue expired, the Plaintiffs commenced an action in the Supreme Court in Suffolk County, asserting claims based on New York State common law.  The Plaintiffs assert a claim for breach of contract and seek damages for, among other things, lost rent, profits, and attorneys' fees.  The Plaintiffs also allege that Commonwealth's refusal to adjust the Plaintiffs' claims was "wrongful, intentional, and arbitrary" and thus the Plaintiffs appear to advance a claim of "bad faith" refusal to comply with the insurance contract.

On August 6, 2012, Commonwealth removed this action to this Court.

Although Commonwealth was unable to conduct any pre-suit Examinations Under Oath as required by the Policy, Commonwealth ultimately deposed those officers and employees of the Plaintiffs that it desired as part of discovery in this litigation.  Conversely, for some unknown reason, from the date this lawsuit was filed through the close of discovery, the Plaintiffs

conducted no discovery – that is, they did not issue a single interrogatory or document request, took no depositions, and made no expert disclosures.

On September 5, 2012, the Plaintiffs filed a motion to stay and remand this action to state court pursuant to 28 U.S.C. § 1447(c).  On April 4, 2013, this Court denied that motion.

Discovery closed on August 14, 2013.  As set forth above, on December 16, 2013, Commonwealth moved pursuant to Fed. R. Civ. P. 56 for summary judgment dismissing the complaint.  In support of that motion, Commonwealth argues that (1) Matrix, as a non-owner of the Buildings, has no viable claim for recovery under the Policy; (2) the Plaintiffs failed to cooperate with Commonwealth in its investigation; (3) the Policy is void due to intentional misrepresentations of material fact on the part of the Plaintiffs; (4) the Plaintiffs cannot establish the value of their losses; and (5) the Plaintiffs cannot recover loss of rent and attorneys' fees.

In opposition, the Plaintiffs contend that (1) both the Wingates and Matrix are "Named Insureds" and have insurable interests under the Policy; (2) they cooperated with Commonwealth in its investigation, and any non-cooperation was not prejudicial in light of the depositions taken as part of this litigation; (3) they did not make any material misrepresentations, intentional or otherwise, in their claims; (4) they have proof of their damages; (2) they are entitled to damages based on Commonwealth's alleged bad-faith refusal to adjust their claims.  As part of their opposition, the Plaintiffs submitted the affidavit of Hess, in which, at times, he purports to give his expert opinion regarding common insurance claim standards and practices.

As noted above, on April 21, 2014, Commonwealth moved to strike Hess's affidavit on the basis that the Plaintiffs failed to disclose him as an expert pursuant to Fed. R. Civ. P. 26(a)(2).

On April 29, 2014, the Plaintiffs filed a letter application, addressed to Judge Lindsay, to re-open discovery; to disclose Hess and Zendler as experts; and for an extension of time to submit a joint pre-trial order. In so moving, the Plaintiffs contend that further discovery is necessary because issues relating to their alleged fraud and non-cooperation were raised for the first time in Commonwealth's motion for summary judgment. Commonwealth opposes this letter motion on several grounds.

The Court will address the three pending motions in turn.

## II.     DISCUSSION

A.  <u>The Letter Motion to Re-Open Discovery and Make Certain Expert Disclosures</u>

Rule 16(b) of the Federal Rules of Civil Procedure requires a court to issue a scheduling order to "limit the time to join other parties, amend the pleadings, complete discovery, and file motions." Fed. R. Civ. P. 16(b)(1), (b)(3)(A). Once a schedule is imposed under Rule 16, it "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "A finding of good cause depends on the diligence of the moving party." <u>Grochowski v. Phoenix Const.</u>, 318 F.3d 80, 86 (2d Cir. 2003). Rule 16(b) is designed, at least in part, "to offer a measure of certainty in pretrial proceedings, ensuring that at some point both the parties and the pleadings will be fixed." <u>Parker v. Columbia Pictures Indus.</u>, 204 F.3d 326, 339-40 (2d Cir. 2000) (internal quotation marks omitted).

In this case, the Plaintiffs seek to re-open discovery, in part, to disclose Hess and Zendler as experts. The Plaintiffs make this motion more than eight months after the close of discovery; more than four months after being served with Commonwealth's motion for summary judgment; and more than a month after filing their opposition to the motion for summary judgment. Also, it

bears mentioning that the Plaintiffs sought no extensions in order to disclose these experts prior to the conclusion of discovery.

The Plaintiffs attribute their failure to make timely disclosures to counsel's heavy calendar. However, a counselor's professional obligations, pressing or otherwise, do not constitute "good cause" under Rule 16. See Arnold v. Krause, Inc., 232 F.R.D. 58, 65 (W.D.N.Y. 2004), aff'd and adopted, 233 F.R.D. 126 (W.D.N.Y. 2005) ("Plaintiffs' counsel offers in support of Plaintiffs' motion to modify the Second Amended Scheduling Order, a litany of personal commitments which arose after entry of the Second Amended Scheduling Order . . . . however, none of the reasons, either individually or cumulatively, impress one as of such a nature that an experienced litigator . . . could not overcome with a modest degree of foresight and even a minimum amount of attention to the requirements of Plaintiffs' case, including the Second Amended Scheduling Order"); Lynch v. Waitman, No. 94 Civ. 0265 (LAK)(BAL), 1995 WL 7991, *3 (S.D.N.Y. 1995) ("The press of other business does not amount to good cause for failure to complete discovery"); Agile Sky Alliance Fund LP v. RBS Citizens, N.A., 09-cv-02786 (MSK)(BNB), 2011 WL 378842, at *2 (D. Colo. 2011) ("Delay due to the press of other business does not give rise to good cause to extend deadlines").

The Second Circuit has also held that the discovery period should not be extended when a party has had ample opportunity to pursue the evidence during discovery. Trebor Sportswear Co., Inc. v. The Limited Stores, Inc., 865 F.2d 506, 511 (2d Cir. 1989) ("trial court may properly deny further discovery if the non-moving party has had a fully adequate opportunity for discovery"); Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 927 (2d Cir. 1985) (denying further discovery because plaintiff had "ample time in which to pursue the discovery that it now claims is essential"); see also Fed. R. Civ. P. 26(b)(2)(C)(ii) (court

"must" limit scope of discovery where "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action").

In this case, contrary to the Plaintiffs' contention, the record indicates that they were on notice that Commonwealth intended to raise issues of fraud and non-cooperation. For example, in the January 23, 2012 letter, Commonwealth identified a number of policy provisions that could impact recovery for the claimed loss, including "Misrepresentation and Fraud"; "Material Change"; and in the Insured's "Requirement After Loss."

On February 8, 2012, Commonwealth notified the Plaintiffs of the fact that none of the documentation requested in the January 23rd letter had been provided. On May 25, 2012, Commonwealth expressly notified Plaintiffs that:

> Misrepresentations regarding these matters would void the Policy, and Matrix's failure to cooperate with CICA in its investigation, by refusing to produce requested information and documentation, is a violation of the Policy's conditions and can negate any liability on the part of CICA for the claimed loss.

Finally, in answering the complaint on August 10, 2012, Commonwealth's interposed affirmative defenses that the Plaintiffs made misrepresentations and fraud in making their claims and that the Plaintiffs' failed to cooperate by refusing to sit for Examinations Under Oath and produce certain requested documents.

The fact that (1) the Plaintiffs' disclosed Hess as a possible lay witness and (2) Hess was previously deposed in this case, does not cure their failure to disclose him as an expert under Fed. R. Civ. 26(a)(2). DVL, Inc. v. Gen. Elec. Co., 811 F. Supp. 2d 579, 591 (N.D.N.Y. 2010), aff'd sub nom. DVL, Inc. v. Niagara Mohawk Power Corp., 490 F. App'x 378 (2d Cir. 2012). In this regard, "[t]he absence of prejudice to the non-moving party [ ] is not alone sufficient to satisfy the good cause requirement of Rule 16(b)." G Investors Holding LLC v. Lincoln Benefit Life Co., No. 09 Civ. 2980 (ALC)(KNF), 2012 U.S. Dist. LEXIS 140676, at *7, 2012 WL

4468184 (S.D.N.Y. Sept. 25, 2012) (citation omitted); Estate of Ratcliffe v. Pradera Realty Co., No. 05 Civ. 10272 (JFK), 2007 U.S. Dist. LEXIS 78070, at *4, 2007 WL 3084977 (S.D.N.Y. Oct. 19, 2007) (absence of prejudice does not fulfill the good cause requirement of Rule 16(b)).

Accordingly, the Court denies that part of the Plaintiffs' letter motion to re-open discovery and designate Hess and Zendler as experts.

B.  The Motion to Strike Hess's Affidavit

Rule 26(a)(2) of the Federal Rules of Civil Procedure requires that parties disclose to other parties the identity of expert witnesses and provide a written report that specifically describes the nature of the expert witness' opinion, supporting evidence, compensation, and qualifications. See Fed. R. Civ. P. 26(a)(2).  Parties are further required to make these disclosures within 90 days before trial "[i]n the absence of other directions from the court, or stipulation by the parties. . . ."  Finally, the parties must supplement these disclosures as required. Fed. R. Civ. P. 26(e)(1).

Rule 37(c) provides sanctions for a failure to disclose under Rule 26:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1).  Ultimately, "[w]hether to grant or deny a motion to strike is vested in the trial court's sound discretion." Pharmacy, Inc. v. Amer. Pharm. Partners, Inc., No. 05–CV–776 (DRH)(AKT), 2007 WL 2728898, at *1 (E.D.N.Y. Sept. 14, 2007).

In its motion to strike, Commonwealth argues that Hess's affidavit contains conclusions of law that the Plaintiffs attempt to proffer as expert testimony.  Commonwealth further contends that such an attempt is improper because the Plaintiffs did not disclose their intent to proffer such expert testimony in accordance with the discovery scheduling order set by Judge Lindsay.

After reviewing Hess's affidavit, the Court agrees that portions of it are essentially a proffer of expert testimony. Hess purports to provide his judgments about typical insurance industry practices and how Commonwealth supposedly deviated from these standards. For instance, Hess renders legal conclusions that Commonwealth did not engage in "good-faith discussions" aimed at an adjustment of the claims "in a normal manner" and that "it is unusual to avoid all attempts to engage in even the most preliminary negotiations with a view towards an adjustment of the claim." (Hess Affid, at ¶¶ 9, 12.) The Court will not consider these and other similar statements contained therein when deciding the pending motion for summary judgment.

However, as Hess was retained by the Plaintiffs in connection with investigating the damaged caused by the fire, some of the statements in his affidavit are relevant and factual, and need not be stricken. Thus, the Court grants in part and denies in part Commonwealth's motion to strike.

C. The Motion for Summary Judgment

"Summary judgment must be granted where the pleadings, the discovery and disclosure materials on file, and any affidavits show 'that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.'" Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56 (a)). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." Ramos v. Baldor Specialty Foods, Inc., 687 F.3d 554, 558 (2d Cir. 2012) (internal

quotation marks omitted). "Where the record taken as a whole could not lead a rational trier of

fact to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557

U.S. 557, 586, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009) (quotation marks and citation omitted);

see also Fabrikant v. French, 691 F.3d 193, 205 (2d Cir. 2012).

      "The moving party bears the burden of establishing the absence of any genuine issue of

material fact." Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010). If

this burden is met, "the opposing party must come forward with specific evidence demonstrating

the existence of a genuine dispute of material fact." Brown, 654 F.3d at 358. In order to defeat

summary judgment, the nonmoving party "must do more than simply show that there is some

metaphysical doubt as to the material facts and may not rely on conclusory allegations or

unsubstantiated speculation." Id. (internal quotation marks and citations omitted).

      Here, in support of its motion for summary judgment, Commonwealth first argues that

Matrix, having no ownership or financial interest in the Complex, cannot recover under the

Policy. The Plaintiffs counter that the definition of "Named Insured" under the Policy includes

"affiliated, related and allied" entities. However, the Court need not resolve this disputed

question of law because, as explained below, even if Matrix could recover under the Policy, the

Court finds that the failure of the Plaintiffs to cooperate with Commonwealth's investigation

precludes recovery as a matter of law.

      Indeed, "[v]iolating an obligation to cooperate constitutes a material breach of the

insurance contract and a defense to indemnification under the policy." Koppelman v. Standard

Fire Ins. Co., No. 05 Civ. 2496 (AKT), 2008 WL 789882, at *3 (E.D.N.Y. March 21, 2008)

(citing Rosenthal v. Prudential Property & Casualty Co., 928 F.2d 493, 494 (2d Cir. 1991)).

Under New York law, to deny insurance coverage on this basis, "an insurance carrier must demonstrate (1) that it acted diligently in seeking to bring about the insured's cooperation, (2) that the efforts employed by the insurer were reasonably calculated to obtain the insured's cooperation, and (3) that the attitude of the insured, after his or her cooperation was sought, was one of willful and avowed obstruction" Allstate Ins. Co. v. United Int'l Ins. Co., 16 A.D.3d 605, 606, 792 N.Y.S.2d 549, 550-51 (2d Dep't 2005).

The insurer alleging violation of a cooperation clause bears a heavy burden to show that the insured's failure to cooperate was deliberate. Thrasher v. United States Liability Ins. Co., 19 N.Y.2d 159, 168, 278 N.Y.S.2d 793, 225 N.E.2d 503 (1967) (citations omitted); Mount Vernon Fire Ins. Co. v. 170 E. 106th St. Realty Corp., 212 A.D.2d 419, 420, 622 N.Y.S.2d 758, 759 (1st Dep't 1995) (citations omitted).  The rationale for imposing a heavy burden on the insurer is "to protect an innocent injured party, who may well have relied upon the fact that the insured had adequate coverage, from being penalized for the imprudence of the insured, over whom he or she has no control." Mount Vernon, 212 A.D.2d at 420-21, 622 N.Y.S.2d 758.  However, the insurer need not show prejudice as a result of the lack of cooperation of its insured to be entitled to summary judgment. Utica Mut. Ins. Co. v. Gruzlewski, 217 A.D.2d 903, 904, 630 N.Y.S.2d 826, 827 (4th Dep't 1995).

Here, under New York law, "[i]t is well established that the failure of an insured to submit to an examination under oath is an absolute defense to a claim under the insurance policy and compliance with a subsequent demand for an examination as part of pretrial discovery pursuant to CPLR article 31 will not cure the defect." Abudayeh v. Fair Plan Ins. Co., 105 A.D.2d 764, 765, 481 N.Y.S.2d 711 (2d Dep't 1984), citing Lentini Bros. Moving & Stor. Co. v.

New York Prop. Ins. Underwriting Assn., 76 A.D.2d 759, 428 N.Y.S. 2d 684 (1st Dep't 1980),

aff'd 53 N.Y.2d 835, 422 N.E.2d 819 (1981).

In Lentini, an action had been brought to recover on a fire insurance claim, commenced

10 months after the loss and 2 months before expiration of the 12-month limitations period

contained in the policy. Following institution of suit, the insurer requested submission of proof

of loss forms and an examination under oath. The Plaintiff did not comply with either request.

Thereafter, in an amended answer, the insurer asserted the failure of the insured to comply with

the terms of the policy and Insurance Law § 168, in failing to render written proofs of loss and to

appear for an examination under oath. After an examination before trial, the carrier moved for

summary judgment, claiming that the failure to comply with the aforesaid conditions was an

absolute defense and barred the suit. The Appellate Division agreed and dismissed, finding that

the plaintiff had failed to fulfill its contractual and statutory obligations. In affirming, the New

York Court of Appeals cited the absence of any reason for non-compliance by the insured,

holding, "[i]n view of the insured's unexcused and willful refusal to comply, there is no reason to

deny summary judgment dismissing the complaint unconditionally." Lentini, 53 N.Y.2d at 837,

440 N.Y.S.2d 174, 422 N.E.2d 819.

Here, unlike in Lentini, the insured provided the insurer with written proofs of loss and, it

appears, minimal additional documentation. Nonetheless, the Court finds that the Plaintiffs

continued failure to submit to EOUs, standing alone, constituted a material, deliberate, and

willful breach of the Policy. Paul Revere Life Ins. Co. v. Cahn, 331 F. App'x 808, 809 (2d Cir.

2009) ("When an insurer demands information from the insured in relation to a claim under a

first-party insurance policy, the insured's willful failure to provide the requested information

constitutes a breach of the policy that entitles the insurer to disclaim coverage."); but see C.I.T.

Leasing Corp. v. Travelers Ins. Co., 145 A.D.2d 973, 974, 536 N.Y.S.2d 344, 345 (4th Dep't 1988) (holding that evidence that the insured partially cooperated in the investigation created a triable issue of fact).

This is so particularly in light of Hess's testimony that he advised Nelson that the failure to comply with the EUO requests would run afoul of the terms of the Policy. Cf. Baerga v. Transtate Ins. Co., 213 A.D.2d 217, 217, 623 N.Y.S.2d 587 (1st Dep't 1995)("The IAS court properly determined that summary judgment in defendant's favor was barred by material triable issues of fact as to whether the plaintiff's failure to cooperate with the defendant in the investigation of the insurance claim, based upon plaintiff's failure to appear for a continued examination under oath, was a willful disregard of plaintiff's policy obligations, or was, in fact, due to the deteriorating physical and mental condition and subsequent suspension from the practice of law of plaintiff's former counsel.")

The fact that the Plaintiffs submitted to depositions in the context of this lawsuit does not absolve them of their independent duty to submit to Examinations Under Oath as required by the Policy. Indeed, an insured cannot "insulate itself against co-operation by commencing an action before there has in fact been repudiation of liability by the insurer." Lentini, 53 N.Y.2d at 836, 422 N.E.2d 819; Cabe v. Aetna Cas. & Sur. Co., 153 A.D.2d 653, 654, 544 N.Y.S.2d 862, 863 (2d Dep't 1989)("The mere fact that the defendant participated in pretrial discovery pursuant to CPLR article 31 did not act as a waiver by the defendant of the right to assert the plaintiff's breach of the cooperation provisions of the insurance policy as a defense to the action."); Southgate Gardens Condo. Assoc., Inc. v. Aspen Specialty Ins. Co., 622 F. Supp. 2d 1332, 1334 (S.D. Fla. 2008)("The giving of recorded statements or the taking of depositions with both sides present does not constitute substantial compliance with [the insured's obligation to submit to an

examination under oath");Union Ins. Co. of Providence v. Williams, 261 F. Supp. 2d 1150, 1153 (E.D. Mo. 2003) (finding that tape-recorded statement did not satisfy the insured's obligation to submit to Examinations Under Oath); Archie v. State Farm Fire & Casualty Co., 813 F. Supp. 1208, 1213 (S.D. Miss. 1992) ("Plaintiff's agreement finally to sit for a deposition, nine months after the insured moment, after plaintiff has filed a lawsuit hardly satisfies the spirit or intent of insurance policy clauses mandating oral examinations.").

As aptly stated by a Florida State appellate court,

> depositions and examinations under oath serve vastly different purposes. First, the obligation to sit for an examination under oath is contractual rather than arising out of the rules of civil procedure. Second, an insured's counsel plays a different role during examinations under oath than during depositions. Third, examinations under oath are taken before litigation to augment the insurer's investigation of the claim while a deposition is not part of the claim investigation process. Fourth, an insured has a duty to volunteer information related to the claim during an examination under oath in accordance with the policy while he would have no such obligation in a deposition.

Goldman v State Farm Fire Gen. Ins. Co., 660 So 2d 300, 305 (Fla Dist Ct App 1995).

Moreover, that the Plaintiffs may have failed to timely cooperate with Commonwealth's investigation upon the advice of counsel does not excuse the breach of their obligations. Davis v. Allstate Ins. Co., 204 A.D.2d 592, 593-94, 612 N.Y.S.2d 195, 196 (2nd Dep't 1994) ("the failure to cooperate was willful" despite the insured's reliance on attorney's position that financial documents were beyond the scope of inquiry); Evans v. Intl. Ins. Co., 168 A.D.2d 374, 376, 562 N.Y.S.2d 692, 694 (1st Dep't 1990) ("That plaintiffs failed to timely cooperate with the defendant's investigation upon the advice of counsel does not excuse the breach of their obligations").

Other than relying on counsel's advice, the Plaintiffs set forth no credible reason excusing their total failure to submit to any Examinations Under Oath as required by the Policy.

In that regard, this case stands in contrast to Abudayeh, wherein the insured had "various correspondence" with the insurer and the scheduled examinations under oath were canceled for reasons that were "fully explained and not indicative of dilatory tactics." Abudayeh, 105 A.D.2d at 766, 481 N.Y.S.2d at 711. Further, the court in Abudayeh found that the actual difficulty in scheduling the Examination Under Oath was due to the insurer requiring the insured to sign a nonwaiver agreement which was not required by the terms of the policy. Here, however, the Plaintiffs simply chose not to respond to Commonwealth's requests for Examinations Under Oath, demonstrating their abject failure to submit to any Examinations Under Oath.

To the extent the Plaintiffs represent that they will comply with Examination Under Oath requests in the future, "[b]ecause failure to perform a condition precedent is an absolute defense to an insurance claim, subsequent offers to comply are of no consequence." Blakeslee v. Royal Ins. Co. of Am., 93 CIV. 1633 (MBM), 1995 WL 122724, at *7 (S.D.N.Y. Mar. 22, 1995); see also Fold–Pak Corp. v. Liberty Mut. Fire Ins. Co., 784 F. Supp. 49, 60 (W.D.N.Y. 1992) (eventual compliance may not cure initial, willful non-compliance).

In sum, the Court finds that the Plaintiffs' willful violation of the Examination Under Oath clause in the Policy precludes recovery as a matter of law. Therefore, that portion of the Commonwealth's motion seeking summary judgment on that ground that the Plaintiffs failed to cooperate is granted, and the complaint is dismissed.

Having dismissed the complaint, the Court declines to address Commonwealth's alternative bases for summary judgment on the breach of contract claim – namely, that the Plaintiffs allegedly made material misrepresentations in their Sworn Proofs and that they cannot show damages.

However, the Court notes that even were it to deny summary judgment to Commonwealth on the basis of failure to cooperate, the Plaintiffs cannot assert a separate claim of "bad faith" because New York does not recognize such a claim with respect to refusal to comply with an insurance contract. Paterra v. Nationwide Mut. Fire Ins. Co., 38 A.D.3d 511, 513, 831 N.Y.S.2d 468, 470 (2d Dep't 2007).

In New York University v. Continental Insurance Company, 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995), the plaintiffs asserted a claim of bad faith against the defendant insurer, seeking compensatory damages. The New York Court of Appeals held that plaintiffs' "bad faith" allegations were "nothing more than a claim based on the alleged breach of the implied covenant of good faith and fair dealing" and concluded that the plaintiffs' allegations were "duplicative" of the breach of contract claim and should have been dismissed by the lower court. New York Univ., 87 N.Y.2d at 319-20.

Thus, here, because the Plaintiffs' allegations of bad faith stem solely from Commonwealth's alleged failure to adjust the Plaintiffs' insurance claims under the Policy, that claim of bad faith is not actionable under New York law. See e.g. Cont'l Info. Systems Corp. v. Federal Ins. Co., 02-cv- 4168 (NRB), 2003 WL 145561, at *4 (S.D.N.Y. 2003)("[W]e will not allow plaintiffs to circumvent controlling authority from the Court of Appeals by cloaking their bad faith claim under the broad heading 'breaches of contract'; whether based on a tort or a contract theory, we find that New York case law does not recognize a claim for extra-contractual damages predicated solely on bad faith denial of insurance coverage.").

Therefore, inasmuch as the Plaintiffs raise a claim of "bad faith" refusal to comply with the Policy or a breach of the covenant of good faith and fair dealing, such a claim fails for the additional reason that such a claim is not actionable under New York law.

### III. CONCLUSIONS

For the foregoing reasons, it is hereby

**ORDERED**, that the Plaintiffs' letter motion dated April 29, 2014 seeking to re-open discovery and make expert disclosures is denied; and it is further

**ORDERED**, that Commonwealth's motion to strike the affidavit of Steven G. Hess is granted in part and denied in part. In particular, the motion to strike is granted to the extent Hess purports to render expert opinions, and is otherwise denied; and it is further

**ORDERED**, that Commonwealth's motion for summary judgment dismissing the complaint is granted in its entirety, the complaint is dismissed, and the Clerk of the Court is directed to close this case.

**SO ORDERED.**
Dated: Central Islip, New York
May 19, 2014

_____*Arthur D. Spatt*_____ _____
   ARTHUR D. SPATT
United States District Judge